Good morning, Your Honors. May it please the Court, Aaron Israelite, Federal Defenders, on behalf of Rene Antonio Mendez. By improperly excluding Mr. Mendez's expert, Mark Owens, the District Court prevented Mr. Mendez from linking his delusion about working for the DEA to his attempted entry into the United States. And this would have proved that Mr. Mendez did not have the specific intent to enter the United States on that day, which is a complete defense. Additionally, the interests of justice demand a new trial because newly discovered evidence, which shows that on a previous occasion, Mr. Mendez had attributed an escape attempt to working for the DEA, would have drastically undercut the government's self-defense. Namely, that if this delusion was real, something like this would have shown up in the record before. I'm going to ask you about the newly discovered evidence. The writer of the pre-sentence report uncovered a much older instance of what I'll call very unusual behavior on the part of your client that might have been helpful to his case. But why is that newly discovered evidence, if the PSR could find it, surely the lawyer could have found it too. I mean, it wasn't new information, it was very old information. Your Honor, turning first to newly discovered evidence, I believe the definition for newly discovered is found after trial and relates to the element. So I think this has more But it has to, it isn't enough to just say, well, I didn't know about it until afterwards. You have to be able to show that with reasonable diligence, you would not have found it in a timely manner. Otherwise, it would just, everything would be new. I mean, it would sort of swallow the rule. And there is a requirement of diligence. Yes, Your Honor, diligence is a requirement, but we acted diligently in this case. We undertook an investigation to find Mr. Mendez's mental health records, his immigration records, his medical records, as well as numerous criminal conviction records. This was a report that was in probation's file. Mr. Mendez, myself, we don't have access to police reports like this. In fact, Your Honor, police reports like this under California law are not subject to Freedom of Information Acts. The only way we would have been able to get this report would have been to request it from the government or ask the court to issue a subpoena. But as the record makes clear, there was no indication that this report existed. The only mention of it was in the 2011 pre-sentence report, a report that I received from prior counsel in trying to find out if there was anything in Mr. Mendez's past that I should be suspicious of. That report merely mentioned the fact of the arrest. So if I had gone to the court, if I had gone to the government, they would have said, what's the relevance here? This is a fishing expedition. So Mr. Mendez did act diligently. I want to go back to your statement. So police reports for a client that you're now representing, police reports from past arrests are not available to counsel in California? That's correct, Your Honor. When we request records from the police department, we don't generally receive police reports. At least my experience is with requesting records pertaining to a conviction. You don't receive the report of arrest with that. What you receive are documents from the court. The records of the police are not generally available. And I've cited the court to a California law stating that, as a California case, finding that police records are exempt from the Freedom of Information Act in California. More importantly here, Your Honor, is if we had any indication that there was something like that available, we would have certainly gone after it. But as I said, there was simply no indication in any of the records that we had. But in light of the defense posed by Mr. Mendez in this case, wouldn't that be the first thing that you're looking for? Is anything related to his history of, possible history of this delusion that he was working for the DEA? Yes, Your Honor. And that's the course that we set out to explore. We requested medical records, psychological records. We reviewed all the arrest records, all the conviction documents that we had. Mr. Mendez's immigration file, which contains a wealth of records pertaining both to immigration files, immigration documents as well as arrest records and sometimes personal history records. There just simply wasn't anything indicating that these reports were arrest or that anything with that arrest had been suspicious. Had there been, we certainly would have pursued that. And I think it's notable that the doctors, both doctors who examined Mr. Mendez, didn't come to us and request that we seek out additional types of records. They seemed satisfied with the record that was before them. Would it be unreasonable to, I guess, infer or expect that if you had asked your client, hey, are there, we know that you are claiming this delusion as a defense here. Are there any other times in the past when you've expressed that similar delusion to others that he might have said, oh, I mean, I don't know if he would have remembered, but is that, is it unreasonable? Because I think that's part of what the district court was saying is that, wait, these are statements from your client. Surely he must have known. And perhaps you just didn't ask. Your Honor, I can affirm that I did ask my client about this. Of course, I can't relate the specific things he said, but I think for somebody like Mr. Mendez who's suffering from this delusion, which is an ongoing thing, a specific instance like this might not stand out. If he believes he's working for the DEA all the time on these missions, this might not be something that is, oh, there was this one time back then. So I certainly met with Mr. Mendez a number of times, many times, during preparing for this trial. And as I said, if I had any information, if there was anything in the record suggesting that these reports were present, I certainly would have sought them out. I can tell you it caught me by surprise. It caught the government by surprise when we discovered that these existed. Well, what maybe you can address, I read the district court is arresting his or her, I can't remember now, decision mainly on the ground that this would not have been likely to result in an acquittal. So maybe you can address why you think this would have changed the outcome. Yes, Your Honor. This case in many ways was a battle of the experts. Our expert versus the government's expert, Dr. Kalish. In attacking Dr. Filoteo, the government primarily focused in their cross-examination on the fact that there was nothing in the record that showed the existence of these delusions until Dr. Filoteo interviewed Mr. Mendez following his arrest. The clear suggestion from the government's cross-examination, which was made clear during the closing, was that Dr. Filoteo had been duped by Mr. Mendez, who lied to him, and that if these delusions were real, there would have been something. And in fact, it's important to look at the testimony of Dr. Kalish because he says he's not willing to rule out delusional disorder. And in fact, specifically with respect to the DEA delusion, he says, I'm not willing to rule that out either. But you think that this is the kind of thing that would have come up before. And then during their closing, the government attacked Dr. Filoteo, essentially attacking Mr. Mendez's claim to have this mental health problem, by repeatedly emphasizing that this had never shown up before. I think a quote from the government is paraphrasing Dr. Kalish to the jury, you would see prior reference to it somewhere in psychological records, somewhere in mental health records, anywhere. So had we had this evidence and had Dr. Filoteo been able to rely on this, which he would have been in coming up with this diagnosis, the primary claim of the government against Mr. Mendez's mental health defense would have been undercut. And more importantly, Dr. Filoteo's credibility would have been substantially raised, because Dr. Filoteo talked about behavior like guarding. The 2005 report shows that Mr. Mendez didn't initially disclose this, but when he was brought to a more comfortable room, made to feel more comfortable, he told the officers about the issues with the DEA. It also shows of him thinking of the DEA and his missions for them as working for a government entity. And of course, this is a specific intent case where Mr. Mendez has to prove that he thought he had permission from the government to enter the country. So and additionally, had this information been available, I think it makes more credible Mr. Mendez's claim that he said, I have DEA, when he was attempting to enter the United States. Except that I have difficulty with, because the officer said that they were speaking in English and that he said, I have an idea, clearly in English, more than once. So I'm not sure that it would have necessarily made any difference on that score. Maybe, certainly the other points you make are, are there. Your Honor, it would have made a difference on that score. And I'd like to address that, because Officer O's recollection that he, that Mr. Mendez spoke completely in English is just that. It's the recollection of a government witness. And Mr. Mendez, as Mr. Mendez's counsel, we were entitled to challenge that. And you can do that, of course, through direct evidence, but we also have circumstantial evidence we can use. And in this case, we established that the DEA delusion existed. And then during cross-examination, Officer O admitted he's not a fluent Spanish speaker. He has enough Spanish to handle little short conversations that occur. Which bolsters his testimony that they were speaking in English, if he doesn't really speak Spanish. No, Your Honor, because Mr. Officer O specifically admitted that he didn't know the Spanish word for DEA. He wouldn't have understood it if he had heard it. But wouldn't the expert have been testifying about facts that simply were not in the record before the court at the time? No, Your Honor, this is really important, because I think, to my mind, this was the main source of confusion with the district court. Our expert, Mr. Owens, was not being called to be an eyewitness. He wasn't going to testify as to what happened at the border. He wasn't going to testify as to what Officer O heard. No, but he would have testified about something said in Spanish when the only testimony before the court was that everything had been said in English. So a discussion of how things are pronounced in Spanish would be sort of apples and oranges. Speculation. Well, Your Honors, I disagree, because the purpose of Owens' testimony was to provide was to show the similarity between the word DEA, IDEA, idea, so that there would be an evidentiary basis for us to argue that, hey, Officer O made a mistake. He didn't realize that he was making a mistake. He thinks he heard I have an idea, but these words are similar. He made that argument anyway based on cross-examination of Mr. O, correct? Well, Your Honor, I made an argument, but what I lacked was an evidentiary basis. And the jury is told by the district judge before going to deliberate, the arguments of the lawyers are not evidence. So if the jury was persuaded by my argument, they may have said, well, hey, where's the evidence that this is actually how these words are pronounced? There is no evidence of that. And that was the sole purpose of Owens' testimony. It wasn't – it was testimony that would allow the jury to infer from the fact of the delusion, the fact that Officer O isn't highly trained in Spanish, doesn't know these words, is working at a very busy port of entry, seeing 1,000 people a day, that he simply thought he heard I have an idea, but Mr. Mendez was actually acting on his delusional belief and saying I have DEA and that this was possible. And I want to be clear, if Officer O had said Mr. Mendez said I have pineapples, it doesn't sound anything like DEA. And I could see the point because there would be no possibility for confusion there. But he said idea. And I have an idea. It doesn't really make sense. It's not – it in and of itself raises some suspicion. So the fact that these words are so similar is just merely an evidentiary link for us to argue that a mistake was made. Thank you, Counsel. You've exceeded your time, but we asked a lot of questions, so you may have a minute for rebuttal when the time comes. Thank you, Your Honor. I appreciate that. We'll hear from the government. Good morning. May it please the Court. Janet Cabral for the United States. The District Court acted within the scope of its discretion, both when it excluded the expert testimony and when it denied the motion for new trial. I just want to address a couple of things raised by Mr. Israelite. With regard to the exclusion of the expert testimony and the argument about whether there was some Spanish conversation, it wasn't just the fact that the conversation that day occurred in English. There was no testimony in the record that it was absolutely irrelevant, the proposed testimony. And the District Court identified the correct legal standard. Is it relevant and is it reliable? And applied that standard to deny the request to admit the evidence. I'm more concerned, I must say, just for myself, about the motion for new trial. And I took it from counsel's narrative that there was no Brady violation claim, that the government was just as surprised as the defense by this report. Why wouldn't it have made a difference in the outcome or at least possibly a strong possibility that it could have made a difference? Your Honor, the delusion that Dr. Filoteo testified to had two prongs, had more than two prongs, but two critical prongs. Number one, that the defendant believed he worked for the DEA. Number two, the defendant believed that he was born in Atlanta. Now those were both statements that the defense argued that Mr. Mendez made that morning. The DEA, the question about the DEA. Exactly, which is the most important part of his defense, which is, I was operating under the delusion that I had been asked by the government to come to the United States to help them out, which would negate the crime. And it is kind of remarkable that in 2005, he not only, I mean it's a very elaborate delusion, they've hired me, they've implanted things in my ear so they can talk to me. I mean, this is not a normally thinking person from this description. And why wouldn't that have strongly corroborated the claim that was being made? It would have corroborated the DEA portion. Which would have been enough for an acquittal. I don't believe so, Your Honor, because the other important part of this was Mr. Mendez's assertion that he also believed he was born in Atlanta. But he only needed one of those two things. If he had believed that he was born in Atlanta and had a right to be here as a native-born citizen, that's one type of negating of the specific intent. But even without that, if in fact the DEA had hired him and told him to come to the United States, he would be here with permission, or at least that would be a reasonable inference for a jury to draw. So why aren't those two things just distinct different ways of demonstrating a lack of the requisite intent? Because what Dr. Filoteo testified to was the existence of a delusional disorder. And I say that to distinguish the delusions, the individual delusions, from the overall psychiatric disorder. Exactly. So I agree with that. But the part of the, I mean a great part of the government's argument seemed to be you shouldn't really credit the delusional disorder because it's just like happened once here at this case and it's awfully convenient that he has this It's not a real thing because it's never happened before. That was a big part of the government's argument. So wouldn't it have made everything much more credible on behalf of the defendant? It would not have made more credible. And I think that in looking at this on an abuse of discretion standard, what it would not have made any more credible was Mr. Mendez's purported belief that he was born in Atlanta. And that was all part and parcel of, and on the day before, because what Dr. Filoteo testified and Dr. Kalish also was with regard to guarding and not disclosing these purported beliefs. Working for the DEA, that might be something that you don't just tell everybody on the street, but working in Atlanta, he was deported the day before. He was deported on May 3rd. And they asked him, where were you born? And he said, Mexico. And if he was, if he suffered from an overriding delusion that he not only worked for the DEA, but he was born in Atlanta and he had these overriding rights to be in the United States, why would he have not disclosed that to the immigration officer? That's a jury argument and it might have been useful. It might have counteracted this additional evidence of his DEA delusion, but why, I guess I just don't, I just don't try to. Can I ask a different question about this particular border checkpoint? Yes, your honor. As I understand it, Mr. Mendez was trying to come into the country on foot. Yes. And there's some, so there's some kind of checkpoint? It's at the port of entry. And so you're at the primary, they wait in line and then they walk up and they have primary booths. And it's every person who tries to come through, I assume is questioned by the official and they're, I assume asked, um, I don't know, like show me something that allows you to come in here. Yes. Okay. So that to me, um, I guess I just start from the premise that the, the defendant's conduct just without knowing anything else makes absolutely no sense. No rational person who had just been removed the day before and was trying to sneak back in knowing that they had no authorization to do so is not, they're going to try to sneak in. They're not going to walk through the checkpoint and get questioned unless they thought they had some, uh, reason to, to think that they'd be allowed through. And so it just seems to me starting out his, his, just the, the actions that you charged him with committing make no sense. And the thing that does seem to explain it is that he thought he had business in Atlanta with the DEA and that he was going to, that was what would allow him to come through. So I guess I'm more where Judge Graber is in thinking that your whole attack on the lack of credibility in the DEA delusion was predicated on, it never came up before and here was the evidence that it did. Just a couple of points. First, you'd be surprised. Um, Mr. Mendez himself, and this was evidence that was, um, offered before the district court. Um, the AFOL custodian talk, um, discussed the fact that this was not the first time that Mr. Mendez had walked up to the port of entry with no documents and sought entry into the United States. He did that in 2004. He was charged with making a false claim to U.S. citizenship. Um, he, he was not, I don't believe he was actually charged on that occasion, but that, that charge was made in the immigration context and he was removed from the United States. So this wasn't the first time that this had happened for him. And it just, So probably not the first time he was under the illusion that he was born in Atlanta. He didn't tell in, in the immigration documents. He did not tell the authorities at that point in time that he was born in Atlanta. He just said, I'm a U.S. citizen. Do you agree that it's difficult, uh, if not impossible to get old arrest reports under California law as Mr. Israelite has stated? I don't think it's impossible. It's difficult, um, with a court order. And that's, and what happened in this case was once the probation officer put this information in the report, um, we sought an order from the district court and had the probation officer release the information to us. So it certainly can be done. It's a, it's a matter of getting a court order to release the information. In the, in the pretrial context? In the pretrial context, it can be done the same way. I, I know that I have done that on occasion. Um, agreed with How would defense counsel do it? I'm sorry? How would you have done it on behalf of the government? How would defense counsel obtain that, uh, under this police report if it had not been referenced in the PSR? I'm sorry, what I meant was in the past I have had defense counsel ask me and we have jointly requested that the district court order it be released. Um, so that defense counsel, if defense counsel and I both request that from the court, the district court can order the release of that information. And I understand the, um, the hesitation with regard to the motion for a new trial and it may be at the end of the day, um, you know, the district court, Judge Battaglia was the one who sat through the entire trial, who heard all of the evidence as it came in, who heard and, and, and heard the different, um, attempts to impeach credibility. At the end of the day, he heard all that testimony. He saw the new report and he evaluated all of that and said, you know what, in my opinion, I don't believe this would have, there was a, it was plausible that the jury would have made a different decision. And I simply don't believe that the arguments are such that that decision was implausible or illogical. Did the government argue before the jury that he had no delusional condition? Uh, what we argued was that he did not suffer from a delusion that included the DEA and Atlanta jointly. If you have no further questions, thank you. Thank you. You have a minute for rebuttal. Just a few quick points since I went over. Um, one, there's been no dispute that Mr. Mendes is a Spanish speaker. And in fact, you can see on the excerpt of records that he used the services of a Spanish language interpreter throughout. With respect to the Atlanta delusion, I believe a rising tide raises all boats here. If it's, if Dr. Filoteo is more credible with respect to his diagnosis of Mr. Mendes suffering from the DEA delusion, I think the jury would have reason to give more credibility to his explanation for why Mr. Mendes may have guarded the Atlanta, the Atlanta delusion and not spoken about that to the jury. And finally, with respect to this 2004 deportation where Mr. Mendes came to the court, that predates the 2005 report where we first see evidence of the DEA delusion. In order to reverse on the decision not to order a new trial, don't we have to find that the having the evidence available would probably have resulted in an acquittal? Isn't that part of the standard? That's correct, Your Honor. And had we had this evidence, it probably would have resulted in an acquittal for the reasons I explained before, namely that it gives substantial credibility to Mr. Mendes' mental health defense while undercutting the government's primary argument against it. Thank you. Thank you, counsel. The case just argued is submitted and we appreciate very much the helpful arguments that both of you presented today.
judges: Tunheim, Graber, Watford